## John H. Bass and Ranald T. McDonald v. James Pease, Sheriff, etc.

1. SALES—*Where Fraudulent per se, Possession.*— Absolute sales of chattel property, where possession is permitted to remain with the vendor, are fraudulent *per se* and void as to creditors and purchasers, unless the retention of possession by the vendor is consistent with the provisions of the deed of transfer or bill of sale; in all such cases the vendor's possession is not merely evidence of fraud, but, by legal inference, is fraud in itself, and can not be rebutted, although the parties may have acted in the best of faith.

2. PUBLIC POLICY—*Collusive Transfers of Property.*—The rule that sales of chattel property, where possession is not consistent with the provisions of the deed of transfer, or bill of sale, and remains with the vendor, is founded in public policy, and is designed to prevent secret and collusive transfers of property, and the procurement of credit upon an apparent ownership different from that which really exists.

3. SALES—*Possession Remaining in the Vendor.*—The law will not permit the owner of personal property to sell it, and still continue in the possession of it. Possession being one of the strongest evidences of title to personal property, if the real ownership is suffered to be in one, and the apparent ownership in another, the latter gains credit as owner and is thus enabled to practice deceit. An absolute sale of personal property, where the possession is permitted to remain with the vendor, is fraudulent *per se* and void as to creditors and purchasers.

4. SAME—*Where the Vendee Will Be Protected.*—If there has been an actual, open, substantial and exclusive change of possession, that follows the title, the vendee will be protected from the creditors of the vendor except for fraud in fact; and whether the fraudulent intent, or fraud in fact exists, is a question of fact to be established by extrinsic proof.

5. SAME—*Signs as Indicative of a Change in Possession.*—There is no law that requires a business man to put his name upon his place of business, as a prerequisite to its full ownership by him.

6. WORDS AND PHRASES—" *Outward,*" " *open,*" " *actual,* " " *visible,*" " *substantial,*" and " *exclusive.*"— The words " outward," "open,"

Bass v. Pease.

" actual," " substantial " and " exclusive," in connection with a change
of possession, mean substantially the same thing. They mean "not
concealed," " not hidden, exposed to view," " free from concealment,
dissimulation, reserve or disguise;" " in full existence; denoting that
which not merely can be, but is; opposed to potential, apparent, con-
structive and imaginary; " " veritable, genuine, certain, absolute; "
" real, at present time, as a matter of fact;" " not merely nominal;
opposed to form; " " actually existing; true;" " not including, admit-
ting or pertaining to any others; undivided; sole;" " opposed to inclu-
sive."

Replevin.—Appeal from the Circuit Court of Cook County; the Hon.
Frank Baker, Judge, presiding. Heard in the Branch Appellate Court
at the March term, 1898. Reversed and remanded. Opinion filed
December 23, 1898.

### Statement of Facts.

Replevin was brought by the appellants, claiming to be
owners of the property in question, as purchasers from
the Plymouth Cycle Manufacturing Company, against the
sheriff, who claimed the right of possession thereto, under
an attachment writ levied thereon at the suit of one Thomp-
son against the said Plymouth Company.

The attached property consisted of part of a stock of
bicycles, contained in a salesroom in the Palmer House,
Chicago, known as the Chicago branch of the Plymouth
Manufacturing Company, located at Plymouth, Indiana.
Such branch, or salesroom, had been carried on as such for
several months, and was conducted by one Lightner, as
manager for the Plymouth Company.

At the time of the levy of the attachment, as well as prior
thereto, the signs at and about the outside entrance to the
salesroom indicated that it was the place for the sale of
bicycles manufactured by the said Plymouth Company, and
that J. S. Lightner was the manager. The printed cards
distributed inside of the room were to the same general
effect.

The bill of sale by the Plymouth Company to the appel-
lants was dated June 18, 1896, and included other property
than that which was attached. It expressed a consideration
of $8,000 in hand paid, and the proof showed that such sum
was paid by the appellants at the time of the delivery of

the bill of sale, " by assumption and after-payment of $8,000 to the First National Bank of Fort Wayne, which the Plymouth Company owed the bank." The attachment was levied June 26, 1896. The day the levy was made, and the day before, the salesroom was visited by persons who testified in behalf of appellee. The visiting witnesses, or some of them, held conversations with Lightner, the manager, and some other person apparently acting as a salesman. One of such witnesses testified to his talk with Lightner June 25th, in which the latter said business was slow, but they were doing pretty well and were selling, and that the " Plymouth people had given them instructions to sell," * * * " which meant that they were to take advantage of the market and let their goods go."

Two others of such witnesses testified to visits made to the salesroom on the day of the levy. One of them testified only to having a card handed to him, in response to his request for a card or catalogue, by one appearing to be a salesman. upon which the printed matter was merely to the general effect already mentioned. That occurred before the levy was made, but upon the same day.

The other one of the two witnesses who visited the salesrooms the day of the levy, testified to two of such visits. One of the visits was before the attachment writ was sued out, and on that occasion, as testified by him, he took from a little table by the door, on which there lay quite a number, one or more of the printed cards just mentioned, and in conversation with one appearing to be a salesman was told " they were selling at a reduced figure." Upon the subsequent visit on the same day, he went with the deputy sheriff who had the writ to levy, and on that occasion, as he testified, the officer asked Mr. Lightner if he were the manager of the Plymouth Cycle Manufacturing Company, and that Mr. Lightner answered, " Yes, sir." Thereupon the officer replied that he had a writ of attachment against the store. That then Mr. Lightner immediately changed his answer, and said: " No. This store belongs to Bass & McDonald, and they. have purchased it."

Thereupon the witness asked Mr. Lightner for evidence of what he claimed, and Lightner's answer was that he did not have it, but he would send for Mr. Munson, which he did, and Munson soon came and said that the store belonged to Bass & McDonald under a bill of sale, which was at Fort Wayne, and that he would get it and show it to the witness the next day. The levy was thereupon made, or perhaps it was made before Mr. Munson arrived, but after he was sent for. The Mr. Munson referred to was the person who was authorized by the appellants, June 10th or 20th, to take possession of the salesroom for them and in their name, and he was then acting as their custodian.

The first thing that was done by appellants in the way of taking possession, after the execution and delivery to them of the bill of sale, June 18th, was a conversation held by McDonald, in Fort Wayne, with one Mahoney, in Chicago, over a long distance telephone, on June 10th. Munson was on that day absent from Chicago, and Mahoney, who was a bookkeeper under Munson, was, in that conversation, directed by McDonald to go over to the salesroom of the Plymouth Company with Mr. Lankenau, the secretary of the Plymouth Company, and take charge and act as custodian of the salesroom for the appellants. Mahoney went with Lankenau as directed, and was there introduced by Lankenau to Lightner as custodian for appellants. At the time of introducing Mahoney to Lightner, Lankenau said to Lightner that appellants had bought the stock, and that Mahoney would act as their custodian. Mahoney testified that there was no other particular conversation had at the time, and that nothing was said as to what Lightner should do; that he, Mahoney, remained there about five or ten minutes looking about, and then going away returned in the afternoon for about five or ten minutes, looking around at the bicycles, and that he had no further talk with Lightner that day about the bicycles, or as to taking charge of the property. Mahoney's functions as custodian appear to have begun and ended June 19th, and consisted only as related.

Mr. Munson returned to Chicago June 20th, and held a telephone conversation with appellant McDonald, in the course of which he was told that appellants had purchased the stock, and was directed to take charge for appellants and act as their custodian and representative. In pursuance of such authority, Munson went immediately to the salesroom and saw and conversed with Mr. Lightner, telling him, among other things, that a sale of the property had been made to appellants, and that they held a bill of sale for it. He also requested Mr. Lightner to act as salesman under his custodianship, and to take an immediate inventory, and to continue to make sales for cash, and account to him daily for the receipts; he also directed Lightner to open a new set of accounts, and he made inquiries of Lightner concerning the lease of the salesroom, and stated that he would at proper times give checks for the rent.

To all of which arrangements Lightner assented. He also on the same or the following day delivered to Lightner a letter, or writing, signed by him as custodian for appellants, setting forth substantially the same matters. And from that day to June 26th Munson went daily to the salesroom, and had interviews there with Lightner about the business, etc., and June 24th and 25th received from Lightner $400 and $300, respectively, as proceeds from sales, in checks payable to appellants.

Munson also procured the insurance policies upon the stock to be transferred, on or about June 23d, to the appellants.

Mr. Lightner, in his testimony, corroborates in most essentials the testimony of Mr. Munson concerning all that transpired between them, and adds that his first information of the sale of the stock to appellants was derived from Mr. Lankenau, the secretary of the Plymouth Company, in an interview with him in the salesroom on the same day of Mahoney's appearance, but at an earlier hour. He further testified that, following the instructions of Mr. Munson, he opened a new set of books for appellants in their names, and thereafter used the old books only in

closing up past transactions; that the bank account previously kept in the name of the Plymouth Company was closed and a new one opened, in his own name, from which he drew, in checks payable to appellants, all moneys subsequently received; that he discharged one of the employes and kept the others, telling them that the business had changed hands and that appellants were the owners; that he used the old stationery, of which a large amount was on hand, stamping upon its face the words, " Bass & McDonald," and that after June 19th the guaranty of wheels sold, which had been previously given by the Plymouth, was refused. Lightner's testimony as to what he at first said to one of appellee's witnesses and the deputy sheriff, in reference to whether he was the manager of the Plymouth Company, is in substance the same as that detailed by appellee's witness. The inference from all his testimony is that after June 19th the business was run for the exclusive benefit of appellants, and not in any respect for the Plymouth Company, and that no representative of that company was around the premises, or had anything whatever to do with the business.

There is no pretense that the signs on the outside of the store were changed before the levy was made.

DUPEE, JUDAH, WILLARD & WOLF, attorneys for appellants.

LOUIS J. PIERSON, attorney for appellee.

MR. JUSTICE SHEPARD, after making the foregoing statement, delivered the opinion of the court.

The question is, was, or not, the claimed purchase by appellants valid, as against the attaching creditor, Thompson. The verdict of the jury, and the judgment appealed from, say it was not.

Ever since the case of Thornton v. Davenport, 1 Scam. 296, the rule has been, in Illinois, that all absolute sales of chattel property, where possession is permitted to remain

with the vendor, are fraudulent *per se*, and void as to creditors and purchasers, unless the retention of possession by the vendor is consistent with the provisions of the deed of transfer or bill or sale. In all such cases the vendor's possession is not merely evidence of fraud, but, by legal inference, is fraud in itself, and can not be rebutted, although the parties may have acted in the best of faith. See also Lawson. v. Funk, 108 Ill. 502; Thompson v. Yeck, 21 Ill. 73; Allen v. Carr, 85 Ill. 388.

The rule is founded in public policy, and is designed to prevent secret and collusive transfers of property, and the procurement of credit upon an apparent ownership, different from that which really exists, and there has been no deviation from it in Illinois, notwithstanding its variations in other States.

"The policy of the law in this State will not permit the owner of personal property to sell it and still continue in the possession of it. Possession being one of the strongest evidences of title to personal property, if the real ownership is suffered to be in one, and the apparent ownership in another, the latter gains credit as owner, and is enabled to practice deceit upon mankind. It is the well-established doctrine of this court that an absolute sale of personal property, where the possession is permitted to remain with the vendor, is fraudulent *per se*, and void as to creditors and purchasers." Ticknor v. McClelland, 84 Ill. 471.

But if there has been an actual, open, substantial and exclusive change of possession that follows the title, the vendee will be protected from the creditors of the vendor, except for fraud in fact; and whether the fraudulent intent, or fraud in fact, exists in such a case, is a question of fact, to be established by extrinsic proofs. Lawson v. Funk, *supra;* Thompson v. Yeck, *supra.*

It is not urged that the sale to appellants was not in good faith, and if it were so urged, the contention would be unavailing, for the decided weight of evidence—we might almost say the uncontradicted evidence—would uphold the *bona fides* of the transaction.

The most that could be urged against it would be that by the transaction certain creditors received a preference

over others.    An individual or corporation, in debt, may make a valid preference in favor of one set of creditors.

The question of fact that remains is, whether or not there took place that substantial and exclusive change of possession that the law requires should follow an absolute sale of chattels, in order that the vendee may be protected from creditors of the vendor.    As between the parties, vendor and vendee, the transaction was in good faith and was complete.    Nothing, in such respects, remained to be done.

Was there such an open manifestation of this executed intention by the parties as to preclude creditors of the vendor company?    It is said there was not, because there was no change of signs upon the outside of the salesroom; no change in or withdrawal of the business cards formerly used by the vendor that lay around the inside of the store and were given out to customers; and because Lightner, the vendor's former manager, was re-hired as head salesman for the vendees, and remained in charge of the salesroom in the same apparent capacity after as before the sale; and because of Lightner's contradictory statements to the officer who served the writ; and of the remarks of Lightner and another salesman, to professed customers, in regard to orders from the vendor company to sell goods peremptorily and at a reduced figure.

In the opinion of this court, in McCord v. Gilbert, 64 Ill. App. 233, it was said: "McCord and Goggin were not required to place their own names upon the saloon signs. We are aware of no law that requires a business man" to put his name upon his place of business as a prerequisite to its full ownership by him; and we see no reason to think that Bass & McDonald were required to do so under the facts in this case.

Mr. Presiding Justice Wall, in Ware v. Hirsch, 19 Ill. App. 274, said: "It may be that a casual observer would not be aware of any change in the situation, but it is not easy to see what else there was to do except to put up a sign, or advertise in some way.    These acts could not have been performed immediately, and we do not understand that they were essential."

The representations made by the cards that were continued in use were just as true after as before the sale of the business to appellants, except in respect of Lightner, the manager. The cards, printed in type of varying size, read as follows:

" THE SUPERB SMALLEY BICYCLES,
Manufactured by Plymouth Cycle Manufacturing Co.,
Plymouth, Ind.
J. S. Lightner, Manager Chicago Branch, Cor. State and Monroe Streets, Palmer House."

The goods there for sale were, after as before, those, and only those, manufactured by the Plymouth Company. Lightner, it is true, was no longer manager, but was head salesman, and it is only with reference to the capacity in which he was acting that the cards were not exactly as truthful after the sale as before it.

It is difficult to see how it could well be held that the use of the cards by the vendees, in the continuance of the business, was in any material sense inconsistent with an otherwise fair intention. As to the re-employment of Lightner, it is well settled that the re-employment of the former employes of the vendor, by the vendee, in a continuation of the transferred business, at the same stand, is not alone enough to stamp the transaction as fraudulent in law, and let in the creditors of the vendor.

The fact that Lightner, in the first instance, answered affirmatively the inquiry of the officer, if he were the manager of the Plymouth Company, and of his and the other salesmen's statements that the company's orders were to sell the goods at reduced figures, etc., ought not to be given much weight, as against a *bona fide* transaction. Statements of such character should be understood with reference to the surrounding circumstances. In this case, they were made to supposed customers, and evidently were put forth as inducements to further conversation and possible sales. There is no doubt that all the retained employes in the store had been told of the sale to appellants, and had accepted employment under appellants.

Bass v. Pease.

We do not think that, as a matter of law, either one or the combined whole of these slight *indicia* of a continued ownership and possession by the Plymouth Company, should control the actual sale and substantial change of possession that, as between the parties, took place.

The transaction that was upheld in Straus v. Minzesheimer, 78 Ill. 492, is, in our opinion, not as strong in respect of a visible change of possession as the one we are considering.

What is, or not, a sufficient compliance with the rule concerning a change of possession of personal property in the case of its absolute sale, in order to make it effectual against creditors of the vendor, must, in the very nature of things, depend upon the circumstances of each transaction, and the subject-matter. The evidences of a substantial and exclusive change of possession in the case of a sale of valuable jewels, would necessarily be quite different from those of a horse, or of a kiln of brick.

The general rule, stated in Thompson v. Yeck, *supra*, and reiterated in Ticknor v. McClelland, *supra*, is that "in all cases the change of possession must be substantial and exclusive."

In Gillette v. Stoddart, 30 Ill. App. 231, it is said (following a Vermont case) that the change of possession must be "obvious," "observable," "visible," "such that the appearances would indicate to an observer that there had been a change."

In Martin v. Duncan, 156 Ill. 274, the Supreme Court said, in applying the law to the facts of that case: "Up to May 16th defendant in error had been in possession as agent of his brother, and if, on May 28th, he was in possession for himself, the change in the character of the possession should have been indicated by such outward, open, actual and visible signs as could be seen and known to the public, or persons dealing with the goods."

At first reading it might seem that the intention existed in these two cases to widen and extend, and add elements to the earlier rule requiring the change to be "substantial and exclusive."

But we doubt that such was intended.

"Outward," "open," "actual," "visible," "substantial" and "exclusive" mean, in the connection that they are employed in the cases referred to, substantially the same thing. They mean "not concealed," "not hidden, exposed to view," "free from concealment, dissimulation, reserve or disguise;" "in full existence; denoting that which not merely can be, but is, opposed to potential, apparent, constructive and imaginary;" "veritable, genuine, certain, absolute;" "real, at present time, as a matter of fact;" "not merely nominal, opposed to form," "actually existing, true;" "not including, admitting or pertaining to any others; undivided, sole;" "opposed to inclusive." Anderson's Law Dictionary and The Century Dictionary, under appropriate headings.

We regard the rule, whichever way expressed, as having been fully satisfied by the change of possession that took place.

It follows that the judgment must be reversed and the cause remanded, upon the ground that the verdict was contrary to the decided weight of the evidence, and that upon the case as made it was error to refuse to instruct the jury to find for the appellants. Reversed and remanded.